HILL *v.* GLASGOW R. Co. *et al.*

*(Circuit Court, D. Kentucky.* August 17, 1888.)

1. CIRCUIT COURTS—JURISDICTIONAL AMOUNT—BILL TO RESTRAIN PAYING OUT ASSETS
   BY DIRECTORS OF CORPORATION.
   Under 24 St. U. S. c. 373, limiting the jurisdiction of circuit courts to suits in
   which the matter in dispute exceeds $2,000, the circuit court has jurisdiction of a
   bill brought by a stockholder for the benefit of the corporation and any other stock-
   holders who may choose to come in, to restrain the directors from paying out assets
   of the corporation to the amount of $100,000, though the complainant holds less
   than $1,000 worth of stock, the matter in dispute in such case being the wrong done
   the corporation.

2. CONSTITUTIONAL LAW—AMENDMENT OF CHARTERS—RIGHTS OF STOCKHOLDERS.
   Under Gen. St. Ky. c. 68, § 8, which reserves to the legislature power to amend
   or repeal any corporate charter granted by it, "provided that no amendment or re-
   peal shall impair other rights previously vested," the legislature has no power to
   amend the charter of a railroad corporation so as to direct that the proceeds arising
   from the lease or sale of the road shall, after paying the corporate debts, be applied
   in payment of municipal bonds given in exchange for corporate stock issued to the
   municipality, since such application of the corporate funds would be unconstitu-
   tional, as interfering with the vested rights of the other stockholders.

3. SAME—INDORSEMENT OF BONDS BY CORPORATION.
   Such application of the corporate funds is not validated by the fact that the cor-
   poration has indorsed the bonds, since such indorsement does not make the corpo-
   ration the principal debtor.

4. CORPORATIONS—STOCKHOLDERS—MISAPPLICATION OF CORPORATE FUNDS.
   A stockholder may enjoin the misapplication of corporate funds under an agree-
   ment entered into before his stock was issued, where he had a vested right to re-
   ceive such stock before the agreement was made.

In Equity. On demurrer to bill.

*Hargis & Eastin* and *Richards & Harris*, for complainant.

*Porter & McQuown* and *Walter Evans*, for defendants.

JACKSON, J. The complainant, as a stockholder in the Glasgow Rail-
road Company, brings this suit to restrain the directors of said company
from the misappropriation of the funds of said corporation. The case
made by the bill is substantially this:

The Glasgow Railroad Company was chartered by the legislature of
Kentucky by an act approved March 6, 1868, and was empowered to
purchase the franchises and unfinished line of road in Barren county be-
longing to the Barren County Railroad Company, which had been pre-
viously chartered in 1856. This purchase was made, and the former
company became vested with the rights, franchises, and property of the
latter company. By an act of the legislature approved February 25,
1869, the charter of the Glasgow Railroad Company was so amended as
to authorize the incorporators, out of their number, or out of such as
might become members by subscription to its stock, to elect a board of
directors, consisting of seven members. By said amendment, the town
of Glasgow and precinct No. 1 of the county of Barren were authorized,
upon proper vote of the citizens thereof, to subscribe for the stock of said
railroad company, the town of Glasgow to the amount of 1,000 shares
of said stock, and precinct No. 1 of said county to the amount of 4,000
shares; said shares being each for the sum of $25. Said subscriptions,

when voted, were, by the terms of the act, to be paid for in the bonds of said town and precinct respectively. Said bonds were directed to be made payable to the president and directors of said Glasgow Railroad Company, and were made negotiable by their written indorsement, were to be taken and received by the company in satisfaction of said subscription, and were to mature in 20 years after date, bearing 7 per cent. interest, payable semi-annually. In pursuance of said authority, and after proper vote of the citizens thereof, said subscriptions were duly made by said town and precinct, and the bonds in payment thereof were issued to the railroad company, and were by the president and directors thereof indorsed and negotiated. The bonds so issued by the town of Glasgow, in payment of its subscription to the capital stock of the road, amounted to $25,000; while those issued by the precinct in payment of its subscription amounted to $100,000. Stock of the railroad company for said amounts was issued to the town of Glasgow and precinct No. 1 of Barren county, respectively, for said subscriptions so made and paid for, and said town and precinct thereby became and were regular stockholders in said railroad company for said sums.

Other subscriptions to the capital stock of the company were made by individuals to the amount of some $9,000. Said amendment of 1869 further provided that, for the taxes levied and paid by the tax-payers of said town and precinct to pay the interest on said bonds, said tax-payers should also be entitled to be stockholders in the railroad company to the extent of or for the amount of taxes so paid. Tax-receipts were to be issued to the tax-payers, which receipts were made negotiable. Certificates of stock were duly issued to the town of Glasgow and precinct No. 1 of Barren county, to the individual subscribers, and to numerous holders of such tax-receipts prior to the year 1880. The railroad company maintained its organization and operated its line of road, under said original and amendatory acts, until April 8, 1880, when another amendment of its charter was made by the legislature. Said amendment, so far as material to this case, was as follows:

"Section 1. That at the annual election of directors of the Glasgow Railroad Company, hereafter held, the judge of the Barren county court and the two justices of the peace for the Glasgow precinct of said county shall have authority, in conjunction, to appoint on behalf of said precinct five persons, and the Glasgow city council two persons, to act as directors of said company for one year, and until their successors are qualified."

"Sec. 4. That the president and directors of said company are hereby authorized and empowered to contract with any other incorporated company, or with individuals, for the sale of said road, and the property, real and personal, and the rights, franchises, and privileges, possessed and owned by said company, or to contract with another company or individuals for either leasing their said road, or for uniting and consolidating with such other company upon such terms and conditions as may be agreed upon; and, in case of such sale or consolidation, said president and directors are hereby authorized to convey by deed to the purchaser, or to such company as may unite and consolidate with the Glasgow Railroad Company, the title thereof to said property, franchises, rights, and privileges; and, by virtue of said conveyance, the grantee shall have, own, and control all the property, rights, and privileges

now held, owned, and controlled by said Glasgow Railroad Company: provided, the proceeds of such sale, lease, or consolidation shall be first applied towards the liquidation and discharge ratably of the bonds issued by the Glasgow precinct and by the town of Glasgow to aid in building said road; and, in case of such consolidation, provisions and stipulations shall be first made for the discharge of debts due by said company, and the proceeds, profits, or income arising from such consolidation shall be then applied towards the payment of said precinct and town bonds: provided, further, that said president and directors shall, by virtue of this act, have no authority whatever, either to sell, lease for a longer time than six years, or consolidate and unite with another company, until the question of accepting and confirming such sale, lease, or consolidation be first submitted to the vote of the qualified voters of said precinct, and a majority of voters at the precinct voting, and a majority of the voters of said city voting, shall vote in favor thereof. That, for the purpose of ascertaining the wish of the voters of said precinct and of said city, it shall be the duty of the judge of the county court, when requested to do so by said president and directors, to cause to be printed and posted, for at least ten days, a notice of such election, in which shall be set forth the terms, conditions, and stipulations of such sale, lease, or consolidation, as may be the case. That said election shall be held, and the vote of the people of said precinct and of said town be taken, at the court-house in Glasgow, after reasonable notice by the officers appointed and qualified, as now required by law in case of election of county or state officers."

Under and by virtue of the authority conferred by said amendment the town of Glasgow and precinct No 1 thereafter alone elected the board of directors for the company, and the directory so elected by these two stockholders subsequently leased the road to the Louisville & Nashville Railroad Company for a term of years, at a stipulated annual rental. This rental, as received, was first applied to the payment of the debts of the company, which were extinguished by the summer of 1885, after which the directors commenced applying the proceeds or rental arising from the lease of the road to the payment of the bonds issued as aforesaid by the town of Glasgow and said precinct No 1, *pro rata*.

This application of the company's funds is the misappropriation or breach of trust and duty on the part of the directory which the bill complains of, and seeks to have restrained. The complainant alleges that he was a tax-payer in said town and precinct from 1870 to 1887; that as such he paid taxes to meet the interest on said bonds issued by said town and precinct in payment of their subscriptions to the capital stock of said company; that by reason of his payment of such taxes he held tax-receipts which entitled him to the rights of a stockholder; that he also purchased other tax-receipts, which were under the law convertible into stock; and that he was, in addition to said tax-receipts, the holder of certificates of stock in said railroad company when said directors, in 1885, commenced applying the company's funds to the payment of the bonds issued as aforesaid by said town and precinct. He alleges that he complained of and protested against the action of said directors, in so appropriating the company's assets, as being illegal and unauthorized by any valid law, and urged and requested said directory to desist from so doing, but that they have have steadily and persistently refused to respect his complaints, and have continued, and are continuing, to so ap-

propriate the company's funds as received, in disregard of the rights of himself, and other minority stockholders; that said town and precinct, holding a large majority of the stock, have the exclusive control of the company's affairs, with the sole and exclusive authority under the amendment of 1880 to select the seven directors of the company, and are thus wrongfully applying the funds of the corporation to the payment of their private debts incurred in obtaining the stock, which now enables them to assert the power of misapplying funds, belonging equally to all the stockholders, to their exclusive right and benefit. The complainant further alleges that said directors and stockholders refuse him any relief, or to change their action in the premises, after repeated applications on his part; that he brings this suit without collusion, for the benefit of the company, and of any and all stockholders who may choose to accept the benefits thereof; that the funds of the company already so misapplied by said directors amount to over $15,000; and that said bonds to that extent have been taken up with the means of the company. It is further alleged that, if said action and proposed continued action of the directors is not enjoined, the company's assets will be used and appropriated to the payment of the remaining outstanding bonds of said town and precinct, which are $100,000 in amount. The complainant further alleges that on the 23d April, 1887, he surrendered to the company all his tax-receipts, original and assigned, and all his certificates of stock, and then received from the company certificates of stock, for 387 shares, which, at $25 each, aggregated the sum of $9,675, as the amount of his holding. The bill seeks to have the bonds already taken up declared assets of the company, and to restrain the directors from making any further payments in that direction.

To the bill as amended, and embodying the foregoing allegations, but in more detail, the defendants have interposed a demurrer, setting up two grounds of defense:

1. That the amount involved is not sufficient to give this court jurisdiction. The bill having been filed since the act of March 3, 1887, (24 St. U. S. c. 373,) went into operation, the position assumed by the demurrants is that the complainant's interest in the litigation or controversy must amount to the value of $2,000, exclusive of costs and interest, in order to confer jurisdiction upon the court, and that, as it distinctly appears from the bill that such interest of the complainant does not exceed half that amount, the suit cannot be maintained.

This position is not well taken. It overlooks and mistakes the true theory and principle of the bill, which is not the assertion of the complainant's private rights, but rather those of the company in which he has an interest. When suit is necessary to enforce corporate rights to avert wrongs threatening the corporate interests, the general rule is that the suit must be brought by the corporate management in the name of the corporation. Individual shareholders ordinarily are not the proper parties to sue or defend on behalf of corporate interests. It is, however, well settled that if the corporate management refuses or fails to enforce corporate rights, and an irreparable injury to the corporate interests is

threatened, a shareholder, in a case where the corporation itself would be entitled to an injunction, may bring suit, on behalf of himself and others interested who may join, to enjoin the threatened injury.

Under the ninty-fourth equity rule, and the decision of the supreme court in *Hawes* v. *Oakland*, 104 U. S. 450, the shareholder so interposing for the protection of the corporate interests is required to set forth in his bill the efforts he has made to induce the corporate management to act or change its action in the matter complained of, and must allege its failure or refusal to sue, and must make the corporation a party defendant to the suit. The first leading case holding the right of the stockholder to sue under such circumstances was *Dodge* v. *Woolsey*, 18 How. 331. In that case, the directors of a bank having declined to enjoin the collection of an illegal tax under circumstances that made their refusal a breach of trust, a shareholder was held to be entitled to maintain the suit. The principle announced in this case has been repeatedly followed and applied by the supreme court. In *Davenport* v. *Dows*, 18 Wall. 626, the court say that "such a suit can only be maintained on the ground that the rights of the corporation are involved. These rights the individual shareholder is allowed to assert in behalf of himself and associates, because the directors of the corporation decline to take the proper steps to assert them. * * * The relief is asked on behalf of the corporation, not the individual shareholder, and if it be granted the complainant derives only an incidental benefit from it."

It is the province and duty of the body corporate or corporate management to protect the interests of all the shareholders against the consequences of unconstitutional action on the part of the state. When, therefore, the corporate management fails or neglects, after proper request or demand, to act in defense of corporate rights and interests, a shareholder may institute and maintain a suit for that purpose, making the corporation and its directory parties defendant. In such cases it is not necessary for the shareholder to show that his private interests or damage, actual or threatened, amounts to the sum which is required to give the federal courts jurisdiction. That jurisdiction is tested by the value of the object to be gained by the suit, as was held by the supreme court in *Railway Co.* v. *Ward*, 2 Black, 485.

Now, applying those rules to the present case, the corporate rights and interests which the bill seeks to assert and protect against past and threatened breaches of trust on the part of the corporate management is largely in excess, in joint value, over the amount necessary to confer jurisdiction. The bill shows that over $15,000 of the corporate funds have been already used in taking up the bonded indebtedness of two of the stockholders, and that the directory are proceeding and claim the right to apply such funds to the further payment of said outstanding bonded indebtedness, which exceeds $100,000. If that action is not warranted by law, if such application is wrongful, and constituted a breach of trust on the part of the directory, then it is clear that the object to be attained by the bill, so far as corporate rights are concerned, is largely in excess of the amount required to confer jurisdiction upon

this court. It follows that this ground of demurrer is not well taken, and must be overruled and disallowed.

2. Under the second ground of demurrer, setting up, generally, a want of equity in the bill, it is claimed that by the fourth section of the act of April 8, 1880, amending its charter, the directors of the company were authorized to make the application of its funds complained of. The first proviso to said section provided that "the proceeds of such sale, lease, or consolidation (which the company by said amendment are authorized to make) shall be first applied to pay off debts said company may owe, and the balance applied towards the liquidation and discharge, ratably, of the bonds issued by the Glasgow precinct and by the town of Glasgow to aid in building said road." This latter clause of the proviso, in terms, directs the application of the corporate funds, after paying off debts owing by the company, to the liquidation and discharge ratably of the bonds issued by said town and precinct in payment of their subscriptions to the capital stock of said railroad company; and, if that provision of the act can be sustained as a valid exercise of legislative power, it will clearly constitute a complete answer to complainant's suit, and deprive him, and others similarly situated, of all right to relief. The constitutionality of said provision is asserted by the defendants under the provisions of a general law enacted by the legislature of Kentucky in 1856, which has since been in force, and is now embodied in section 8, c. 68, Gen. St. Ky., and reads as follows:

"All charters and grants of or to corporations or amendments thereof, enacted or granted since the 14th of February, 1856, and all other statutes, shall be subject to amendment or repeal, at the will of the legislature, unless a contrary intent be therein plainly expressed: provided, that, whilst privileges and franchises so granted may be changed or repealed, no amendment or repeal shall impair other rights previously vested."

The charter of the Glasgow Railroad Company contains no plainly expressed intent contrary to the right thus reserved to the legislature to amend or repeal its charter, and it may be conceded that such amendment or repeal may be made at the will or pleasure of the legislature, without the action or consent of the corporation. But the question here presented is, was the amendatory act of April 8, 1880, in so far as it undertook to direct that the corporate funds, after paying off the company's debts, should be applied towards the liquidation and discharge of the indebtedness of two of the principal stockholders of the company, a valid exercise of the reserved power to amend, alter, or repeal the company's charter, or its privileges and franchises? The statute in express terms limits and confines the power of amendment or repeal to the "privileges and franchises granted" the corporation, and provides that, in dealing with such privileges and franchises, "other rights previously vested" shall not be impaired. In the absence of this clearly expressed intent of the legislature not to affect or impair other rights previously vested, in dealing with the privileges and franchises of corporations by way of amendment or repeal, it is well settled by the authorities that the power of the legislature, under a reservation of the right to alter, amend, or re-

peal charters, is not unlimited, and that under such authority changes and alterations cannot be constitutionally made by the legislature which disturb private contracts or rights acquired under such charters before the power of amendment or repeal was exercised. As said by Justice SWAYNE, giving the opinion of the court in *Shields* v. *Ohio*, 95 U. S. 319–324:

"The power of alteration and amendment is not without limit. The alterations must be reasonable. They must be made in good faith, and be consistent with the scope and object of the act of incorporation. Sheer oppression and wrong cannot be inflicted under the guise of amendment or alteration. Beyond the sphere of the reserved powers, the vested rights of property of corporations in such cases are surrounded by the same sanctions and are as inviolable as in other cases."

In the later case of *Greenwood* v. *Freight Co.*, 105 U. S. 13–18, Mr. Justice MILLER, speaking for the court on the same question, says:

"Personal and real property acquired by the corporation during its lawful existence, rights of contract or choses in action so acquired, and which do not in their nature depend upon the general powers conferred by the charter, are not destroyed by such repeal; and the courts may, if the legislature does not provide some special remedy, enforce such rights by the means within their power. The rights of the shareholders of such a corporation to their interests in its property are not annihilated by such a repeal, and there must remain in the courts the power to protect those rights."

The principle of these and other decisions upon the subject of amending or repealing charters under a reservation of power so to do, is that the legislature may change or modify the privileges and franchises which the state has granted to the corporation, and which concern the interests of the public; but dealing with what it has bestowed, either by way of withdrawal or of alteration, the state may not go further, and so legislate as to disturb, affect, or impair rights either of the corporation or of its shareholders, previously acquired, while the corporate functions were being lawfully exercised. All rights thus acquired, of whatever character, are surrounded and protected by constitutional sanctions and guaranties higher and superior to the legislative power of amendment or repeal. The decisions in the court of appeals of this state clearly recognize these general principles. Then, in the case of *City of Covington* v. *Bridge Co.*, 10 Bush, 76, the court say, in reference to the power of amendment, that "it is settled by an unbroken line of authority that the charter of a private corporation may vest such rights in the corporators and stockholders that no subsequent legislation can impair or diminish, and it is equally as well settled that such amendments of a charter may be made as are necessary to carry into effect or accomplish the purposes for which the charter was obtained." So in *Griffin* v. *Insurance Co.*, 3 Bush, 594, it is said that "the proviso [to act of 1856] was intended to secure the rights of beneficiaries and others, vested under the charter before its amendment or repeal, and does not affect the mere power to repeal the franchises." See, also, *Orr* v. *Bracken Co.*, 81 Ky. 596.

The right reserved by the General Statutes to amend or repeal privileges and franchises conferred by the charter is one thing, but the power

to take from the stockholders or others rights or property interests, acquired or vested before such repeal or amendment, is another and quite a different thing. The first comes within the legislative authority; the second lies beyond the limits of such authority, because the legislature cannot defeat or impair other rights previously vested, which have sprung up or grown out of such corporate privileges and franchises while the corporation was allowed to exercise the same. Applying these principles to the case made by the bill, the conclusion seems to be irresistible that the amendment of April 8, 1880, in so far as it directed that the proceeds arising or to arise from the sale or lease of the road should be applied, after paying the company's debts, to the liquidation of the indebtedness of two of the company's stockholders, to the exclusion of the other stockholders, was beyond the legislative power.

If the legislature had, under the reserved powers, repealed the charter, and given the assets and property of the company, after the payment of its debts, to only two of its stockholders, designated by name, can it admit of any question that such legislation would have been unconstitutional and void, so far as it undertook to dispose of the surplus corporate property? We think not. After the payment of debts, corporate assets belong and must be distributed equally and ratably among the stockholders therein, as the beneficial owners thereof. This equality of ownership and right of ratable distribution in surplus assets of the corporation, acquired before amendment or repeal of the company's charter, cannot be defeated or impaired by such amendment or repeal. It is a valid right of property, which does not fall within the power to deal with the privileges and franchises of the corporation. The legislature could not, by repeal or amendment of the charter, bestow all the surplus property of the corporation upon certain stockholders to the exclusion of others; nor could it lawfully direct that such corporate property or funds should be applied to the payment of the indebtedness of a portion of the stockholders of the company. This is what the proviso to the amendment of April 8, 1880, attempts, and what the directory of the corporation have done, and declare they will continue to do, in appropriating the earnings of the company, arising from the lease of its road, to the payment of the bonded indebtedness of the town of Glasgow and precinct No. 1. Said town and precinct incurred said indebtedness in securing the stock in the company which now enables them to elect its directory and control its affairs. They could legally, as stockholders, take their share of such earnings, leaving to other stockholders the same right, and, after receiving such share, could apply the same to the payment of their own indebtedness. But for the legislature to empower them to select the corporate management, and then direct such management to apply the corporate funds, after paying debts, to the discharge of the indebtedness of said two stockholders, is a clear violation of the vested rights of other stockholders, and is wanting in constitutional authority.

It is suggested by counsel for defendants that, inasmuch as the company had to indorse these bonds of said town and precinct at the time

of using or negotiating them, the company thereby became liable as such indorsers, and the legislature could lawfully require its management to pay such bonds for that reason. It nowhere appears in the pleadings that the company has become liable to the holders of said bonds by reason of such indorsement. It does appear that said bonds are not yet due, and, if the company incurred any liability by reason of its indorsement of the bonds, such liability is contingent, and cannot be legally fixed as a settled indebtedness until the maturity and nonpayment of the bonds by the maker. But, aside from this, as between the company and said town and precinct, the latter are primarily liable for the face of the bonds and interest. If the indorsers should take them up, it could demand the payment thereof from the maker. These rights the legislature could not impair, under the guise of amending the charter. It could not lawfully direct the indorsers to discharge the obligation for the exoneration of the makers. This would be just as violative of rights of the other stockholders as to give the corporate funds to two favored and preferred stockholders. I think it has been decided, although I cannot now recall the precise case, that a state cannot, by legislative action, secure or direct the payment of the contingent liabilities of an insolvent corporation out of its assets, at the expense or to the exclusion and injury of matured, legal, and subsisting debts of the corporation. But, aside from this feature of the question, the attempt to impose upon the railroad company the duty of liquidating and discharging the indebtedness incurred by two of its stockholders in paying for their stock in the corporation is not a constitutional exercise of the legislative power of amendment, when, as in the present case, there are other stockholders, entitled to share proportionately in the corporate funds with the two favored stockholders.

It appears from the allegations of the bill that the directors, against the protest of complainant, commenced enforcing said amendment in favor of said town and precinct in 1885. The complainant avers that he was then interested in the corporation, having vested rights in its assets. He alleges that he was then a shareholder, and that by virtue of his tax-receipts, original and purchased, he had the right to further stock. This latter right is claimed under the twenty-first section of the amendatory act of 1869, which provided "that it shall be the duty of the collector of taxes for said town to give to each tax-payer a receipt for the amount of taxes paid by him, which shall be negotiable by indorsement; and upon the presentation of a receipt or receipts amounting to $25, to the president and directors of said road, or such officer or agent as they may select for that purpose, by any person, he shall be entitled to receive a certificate of stock, and to be entered on the books of said company as a stockholder, to the amount of receipts so presented." The holder of tax-receipts had, under the provisions of the law, a vested right to an equal amount of stock in the company, which was required to be issued to him, when he presented receipts amounting to $25. This right complainant had as a tax-payer and as a purchaser of tax-receipts prior to the amendment of April 8, 1880, and prior to 1885, when the directors

first commenced making the application of the corporate funds complained of. As an actual shareholder, whether the certificates stood in his own name or not, he can, on behalf of the company, complain of the misappropriations as breaches of trust from the date of their commencement. As a tax-receipt holder entitled to have stock certificates issued to him, and which were issued April 23, 1887, he may, on behalf of the corporation, complain of the misapplication of corporate funds since that date, if not before, and in both respects he may properly enjoin future misapplications of the company's funds. The proposition is not sound that, so far as the stock was obtained by virtue of the surrender of his tax-receipts, he is precluded from any relief, because the amendment of April 8, 1880, had then been accepted. Its acceptance could not make it constitutional, nor defeat the right of complainant to have stock, with all the incidents attaching thereto, issued to him for said receipts; and when issued, if not before, his right to a proportionate share of and interest in the corporate property, not previously legally appropriated, attached; and if the corporate management, against his protest and in disregard of his complaint, continued, or threaten to continue, a misapplication of the corporate funds, he may invoke the aid of the court to restrain such continued breach of trust.

If, therefore, it be conceded that, in respect to his tax-receipts, complainant only became a stockholder on the 23d April, 1887, as claimed by defendant's counsel, under the provisions of sections 15 and 27 of the act of February 25, 1869, still his right to relief, as against future or threatened misapplications and breaches of trust, is not defeated; for he had a vested right to become such stockholder at that time by reason of his holding and ownership of such tax-receipts, and thenceforward, if not sooner, he could invoke the aid of a court of equity to restrain the corporate management from making other or further misappropriations of the corporate funds. His delay in obtaining such certificates, to which he was entitled, could, at most, only affect his right to complain of past misapplications. It in no wise validated the unconstitutional legislation, or made it operative and binding upon him in respect to future misapplications. So, both as an actual stockholder when the misapplication complained of commenced, in 1885, and as a stockholder by virtue of his tax-receipts converted into stock certificates on April 23, 1887, the complainant is in position to claim the interposition of the court. He has, by his amended bill, fully complied with the requirements of the law and rule of practice, in setting forth the efforts made to secure proper action in the premises on the part of the corporate management, and their failure and refusal to desist from the illegal course they were pursuing in misapplying the corporate funds. He further shows, and the court can readily see from the situation of the parties, that an appeal to the shareholders would be useless and idle, and productive of no relief.

After a careful consideration of the case in all its aspects and bearings, the court is clearly of the opinion that the bill, as amended, presents a case properly calling for the interposition of the court, and entitling the complainant, on behalf of the corporation and other shareholders, to the

relief sought. It follows that the demurrer must be overruled and disallowed on both grounds. It is accordingly so ordered and adjudged, at the cost of defendants. It is further ordered that an injunction issue restraining and enjoining the defendant the Glasgow Railroad Company, and its directors, or their successors in office, from making any other or further applications of the corporate funds of said company, however derived, to the payment, liquidation, and discharge of the bonds heretofore issued by said town of Glasgow and precinct No. 1 of Barren county, Ky., in payment of their subscriptions to the capital stock of said Glasgow Railroad Company; such injunction to continue in full force till the further order of this court in the premises. The defendants will be allowed until the October rules, 1888, to file their answers to the bill.